IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:07-CV-1-D

| | |
|---|---|
| EDDIE LAREECE PITTMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| HUNT CONSTRUCTION GROUP (in care ) | |
| of Chief Executive Officer Robert G. Hunt), ) | |
| BILLY STEWART, Superintendent for Hunt ) | |
| project in Chapel Hill, in his official capacity, ) | |
| and CHRIS ARMSTRONG, Manager for Hunt ) | |
| project in Chapel Hill, in his official capacity, ) | |
| ) | |
| Defendants. ) | |

On January 8, 2007, Plaintiff Eddie LaReece Pittman ("Pittman" or "plaintiff") filed this Title VII action against defendants Hunt Construction Group ("Hunt Construction"), Billy Stewart ("Stewart"), and Chris Armstrong ("Armstrong") (collectively, "defendants"). On June 18, 2007, the court entered an order [D.E. 22] granting defendants' motion to dismiss Stewart and Armstrong as defendants. Consequently, only Hunt Construction remained as a defendant in this case.

On March 28, 2008, Hunt Construction moved for summary judgment. Plaintiff responded on May 21, 2008, and Hunt Construction replied on June 9, 2008. For the reasons discussed below, Hunt Construction's motion for summary judgment is granted.

I.

The court considers the facts in the light most favorable to Pittman, the non-moving party. See, e.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). In the fall of 2006, Pittman was employed by TradeStaff, a temporary employment agency. See Compl. 2. Hunt Construction was the general contractor for the new Genetics Medicine Building at the University

of North Carolina in Chapel Hill ("the project"). See, e.g., Armstrong Aff. ¶ 2. Armstrong was the manager of the project, and Stewart was the superintendent of the project. Id.; Stewart Aff. ¶ 2. Stewart was Armstrong's subordinate. Stewart Aff. ¶ 2.

During the fall of 2006, Hunt Construction needed approximately 15 temporary laborers for the project, and it engaged TradeStaff to provide these temporary laborers. E.g., Armstrong Aff. ¶ 3. The need for temporary laborers at large construction sites like the project waxes and wanes. See, e.g., Pittman Dep. 127:20–128:2. When Hunt Construction's need for temporary laborers decreased, Armstrong would decide how many temporary laborer positions were no longer necessary, and would instruct Stewart to reduce the staff by determining which temporary laborers to retain and which temporary laborers to terminate. See Armstrong Aff. ¶ 4; Stewart Aff. ¶¶ 4–5.

TradeStaff assigned Pittman to the project in early September 2006. Compl. 2. TradeStaff manager Miles Johnson ("Johnson") told Pittman that, if Pittman adequately performed his duties, then his assignment to the project would be long-term. Id. Plaintiff adequately performed his duties at the project. Id.

On October 3, 2006, while working at the project site, Pittman sat down to eat lunch. Id. At that time, a man named Kelvin Wood ("Wood") sat down across from Pittman. Id. Kelvin Wood is nicknamed "KT." See id.; Stewart Aff. ¶ 9. Wood was not a Hunt Construction employee or a TradeStaff employee. See Stewart Aff. ¶ 9. Rather, he was the foreman for a steelwork subcontracting firm called National Rebar. Id.

After Wood sat down next to Pittman, Wood asked Pittman if he was alright. Compl. 2. Wood stated that Pittman was too quiet, and that there must be something wrong with him. Id. Wood then began a conversation with other individuals who were eating lunch nearby, stating, "You gotta watch quiet people . . . they might be ready to snap at any time and kill someone." Id. at 2–3.

2

Pittman felt insulted and believed that Wood had stereotyped Pittman due to Pittman's race and "the way [Pittman] carried himself." Id. at 3. Pittman called Johnson to complain about what Pittman believed was Wood's racially-discriminatory comment. See id. Johnson told Pittman to type up a complaint and send it to the TradeStaff office. See id. Pittman typed up a complaint and mailed it to TradeStaff that day. Id.

On October 5, 2006, Johnson called Pittman to notify Pittman that Johnson had received the complaint. Id. Johnson stated that he would immediately start investigating by contacting Stewart. Id. However, Johnson did not speak to Stewart or anyone else at Hunt Construction regarding Pittman's complaint. Johnson Aff. ¶ 9. Instead, Johnson told his supervisor at TradeStaff, Greg Bunn ("Bunn"), that Pittman had filed a complaint. Id. ¶ 6.

Sometime during the week that included October 6, 2006, Armstrong decided to reduce the TradeStaff temporary labor force by three persons, and instructed Stewart to choose which three laborers should be terminated. Armstrong Aff. ¶ 4. Pittman was among the three temporary laborers that Stewart decided to terminate. Stewart Aff. ¶ 6; Bunn Aff. ¶ 6. On October 6, 2006, Stewart called Bunn to inform TradeStaff that Hunt Construction no longer needed three temporary laborers, including Pittman. Stewart Aff. ¶ 6; Bunn Aff. ¶ 6. Bunn then asked Stewart if Stewart had heard any complaints from any TradeStaff employees. Bunn Aff. ¶ 7. Stewart said that he had not. Id. Bunn did not inform Stewart about Pittman's complaint. Id.

Later that same day, Bunn told Johnson that Hunt Construction no longer needed Pittman and the other two temporary laborers whom Stewart had decided to terminate. Id. ¶ 8. Bunn instructed Johnson to reassign these three individuals. Id. Johnson then called Pittman and informed him that Hunt Construction no longer needed his services. Pittman Dep. 188:5–188:10.

3

At some point a few days after Pittman was no longer working for TradeStaff on the project, Armstrong received Pittman's complaint through the Equal Employment Opportunity Commission ("EEOC"). Armstrong Aff. ¶ 5. This was the first time that anyone at Hunt Construction learned of Pittman's complaint about Wood's allegedly racially-discriminatory comment. See id. On October 20, 2008, Bunn met with Armstrong. Bunn Aff. ¶ 11. During this meeting, Armstrong told Bunn that he had received Pittman's EEOC complaint. Id. This was the first time that anyone at TradeStaff had spoken to anyone at Hunt Construction about Pittman's complaint. See id.

Pittman was one of nine TradeStaff temporary laborers whose assignment at the project ended in October 2006. See Bunn Aff. ¶¶ 8–9, 12. The assignments ended because Hunt Construction no longer needed their services at the project. Armstrong Aff. ¶ 7. To Hunt Construction's knowledge, none of the TradeStaff employees who were terminated had ever made a complaint of any kind. See id.

After the EEOC issued a right-to-sue letter, Pittman filed suit in this court. Pittman argues that Hunt Construction terminated his employment in retaliation for his complaining about Wood's allegedly racially-discriminatory remark, and that Hunt Construction thereby violated Title VII of the Civil Rights Act of 1964.

II.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any of [its] employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Although the parties have not briefed the issue, the court assumes (without deciding) that Hunt Construction qualifies as plaintiff's "employer" for Title VII purposes. See, e.g., Mullis v. Mechs. & Farmers Bank, 994 F. Supp. 680, 685 (M.D.N.C. 1997). Here, Pittman lacks

4

direct evidence that Hunt Construction retaliated against him in violation of Title VII, and therefore proceeds under the burden-shifting framework first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

A plaintiff may prove retaliation under the burden-shifting framework of McDonnell Douglas by following a three-step process. First, the plaintiff must establish a prima facie case of retaliation. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). If the plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to produce evidence that the defendant took the adverse employment action for a legitimate, nonretaliatory reason. See, e.g., St. Mary's Honor Ctr., 509 U.S. at 506–07; Burdine, 450 U.S. at 253–54. If the defendant meets its burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's stated reason for taking the adverse employment action was in fact a mere pretext for retaliation. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).

In analyzing this framework, the court applies the familiar law of summary judgment. Summary judgment is appropriate when there is no genuine dispute of material fact such that a rational jury could not find in favor of the nonmoving party and the movant is entitled to judgment as a matter of law. See, e.g., Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Diebold, 369 U.S. at 655.

III.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) his employer took an action against him which a reasonable employee would

5

find materially adverse; and (3) the employer took the materially adverse employment action because of the protected activity. See, e.g., Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67–68 (2006); Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). A plaintiff cannot prove causation, the third element of the prima facie case, without showing that the employer actually had knowledge of the protected activity. See, e.g., Gibson v. Old Town Trolley Tours of Wash., D.C., Inc., 160 F.3d 177, 181–82 (4th Cir. 1998) ("Knowledge is necessary to establish causation . . . ."); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) ("[B]y definition, an employer cannot take action because of a factor of which it is unaware . . . .").

Here, even assuming (without deciding) that Pittman could meet the first two elements of a prima facie case for retaliation, he cannot show that Hunt Construction terminated him because of his race discrimination complaint. There is no evidence from which a rational jury could find that Hunt Construction's decisionmaker (i.e., Stewart) knew about Pittman's complaint at the time that Stewart decided to terminate Pittman's employment. Cf. Hill, 354 F.3d at 286 (the inquiry in a Title VII case must focus on the knowledge of the decisionmaker). Pittman himself acknowledges that he has no personal knowledge that anyone at TradeStaff told Stewart or anyone else at Hunt Construction about the complaint. See Pittman Dep. 175:7–175:21. In fact, Pittman acknowledges that the only evidence upon which he bases his allegation is Johnson's alleged statement to him that Johnson would investigate his complaint by contacting Stewart. See id. However, regardless of what Johnson allegedly told Pittman he would do, the record establishes that neither Johnson nor anyone else at TradeStaff ever in fact advised Stewart, Armstrong, or anyone else at Hunt Construction about Pittman's complaint until after Pittman had been terminated. See, e.g., Bunn Aff. ¶ 7 ("During my conversation with Mr. Stewart on October 6, 2006, . . . I did not tell Mr. Stewart

6

about Mr. Pittman's complaint."); Johnson Aff. ¶ 9 ("At no time did I speak to anyone at Hunt about Mr. Pittman's complaint of discrimination."); Stewart Aff. ¶ 7 ("At the time I made that decision [to terminate Pittman], I did not know that Mr. Pittman made a complaint of discrimination. I did not know that until Hunt [Construction] received Mr. Pittman's EEOC Complaint sometime later."); Armstrong Aff. ¶ 5 ("At the time I made the decision to reduce the number of TradeStaff employees at the Project, I was completely unaware that Mr. Pittman had made a complaint of discrimination to anyone.").

Pittman attempts to show a causal connection by pointing out the temporal proximity between his making the complaint to TradeStaff and his termination. Pl.'s Reply to Def.'s Mot. for Summ. J. 11, 16. Pittman cites several cases, including Cifra v. General Electric Co., 252 F.3d 205 (2d Cir. 2001), and Strother v. Southern California Permanente Medical Group, 79 F.3d 859 (9th Cir. 1996), and argues that temporal proximity alone is enough to establish a prima facie case. See id. However, neither of these cases help Pittman. In each case it was undisputed that the employer's decisionmaker had actual knowledge of the protected activity at the time the employer's decisionmaker made the challenged employment decisions. See Cifra, 252 F.3d at 216; Strother, 79 F.3d at 869–70.

Pittman also contends that Bunn, Johnson, Stewart, and Armstrong are all lying in their affidavits, because Hunt Construction is a powerful corporation that is using its influence to cover up the truth about his termination. See Pl.'s Reply to Def.'s Mot. for Summ. J. 6–7. Pittman further contends that TradeStaff and its employees are willing to lie to preserve their relationship with Hunt Construction. See id. Plaintiff presents nothing to support his wild accusations of perjury and a far-ranging conspiracy to obstruct justice. Plaintiff's speculation and conjecture are not sufficient to defeat summary judgment. See, e.g., Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 817–18

7

(4th Cir. 1995); Choe v. Smith, No. 94-2143, 1995 WL 541675, at *2 (4th Cir. Sept. 13, 1995) (per curiam) (unpublished). No rational jury could credit Pittman's unsupported conspiracy theory in the face of the overwhelming evidence showing that neither Hunt Construction nor its decisionmaker Stewart had any knowledge of plaintiff's race discrimination complaint at the time Hunt Construction decided to terminate plaintiff's employment. Accordingly, Hunt Construction is entitled to summary judgment.[1]

IV.

For the reasons discussed, Hunt Construction's motion for summary judgment is GRANTED. The Clerk is DIRECTED to close this case.

SO ORDERED. This **26** day of June 2008.

JAMES C. DEVER III
United States District Judge

---

[1] In light of this conclusion, the court need not address Hunt Construction's alternative argument that Pittman failed to come forward with sufficient evidence from which a rational jury could conclude that Hunt Construction's proffered reason for terminating Pittman's employment was a pretext (i.e., a sham) designed to mask retaliation. See Reeves, 530 U.S. at 143; Holland, 487 F.3d at 214–15.